Good morning, everyone. I'll call the first case, R.B. v. Westmoreland County. Mr. Lindsey. May it please the court, my name is Alexander Lindsey and I represent the plaintiffs, the appellants in this case, R.B., V.B., and A.B. I would request two minutes for rebuttal time. May it please the court, this court recently, indeed in January, handed down the decision of B.S. v. Somerset County, and this was stated. The due process is implicated when protective interests such as a parent's liberty interest in the custody, care, and management of his or her children are subjected to intrusion by the state. An individual must ordinarily be afforded the opportunity to be heard at a meaningful time and in a meaningful manner. In the same, the next paragraph, it says that it is axiomatic that at least some process is required when a state seeks to alter, terminate, or suspend a parent's right to custody of his or her minor children. I do believe what Judge Schwab said. They agreed to the procedure. It was a voluntary agreement. Well, Your Honor. Shouldn't that be argument number one? What facts in your 12B6, what facts in your complaint, in your amended complaint, make it plausible that the agreement was not voluntary? Because it was voluntary. Voluntary. It was absolutely not voluntary, and I'm glad you brought that up. What facts in your complaint or your amended complaint show that Judge Schwab was wrong? The facts are, as was stated, that RB, the father in this case, suspected that his daughter was having a sexual relationship with Barry O'Neill, a 20-year-old man. He then, he calls the police and he is informed, and the conversation we're talking about is the telephone conversation that occurred that first night on May 9th. And in that conversation, the representative of the Children's Bureau told him, you have been accused, we have the custody of your daughter, the police have her, number one. Number two, you are being accused of abusing her, physically, sexually abusing her. Number three, she can have, you're losing custody of her. That wasn't exactly what was said, losing custody of her. Well, they didn't say that, they said that you can't see her. In other words, what's alleged in the complaint is that they had her... She will either go to the O'Neills... What's that? She will either go to O'Neills or she will go into foster care at your expense. Yes. Do you agree to that? That's right. That's what I was waiting for you to tell me. Okay, that exact same conversation in Croft was called by this court to be blatantly coercive. It's the same thing, the only difference is where the child is going or what the separation is. Here's what the choice is, and this is what we're complaining about. They say, our position is that Westmoreland County says to the parent, you can't, you're out, we have the child. Now, we'll give you a choice. You don't have a choice about whether she can stay with you. You don't have a choice whether you can have her stay in your home. It's like saying, listen, you have a choice as to whether or not we're taking the child. You will not have the child, and you have no input into that decision. The issue is, are you going to stay in a red house or a green house? If he says a green house, well, then it's voluntary. It's where the child goes is not the issue. The real issue is the separation of the child from the parent. Are you arguing that given the allegations of sexual abuse by the father, that she should nonetheless have remained in the home? I am not arguing that. What I am arguing is this, and it's very, very important because in our cases, they say that we have to look at the circumstances surrounding it. The issue is whether it's when we come to substantive due process, shocking the conscious. What we're looking at is whether this is an instantaneous decision. We don't get near substantive due process, in my view, until we decide whether or not there was a voluntary agreement. Now, here's baseball season coming up. This is one over the plate. Is voluntariness a question of fact? Yes. And this was a 12B6. That's where I think your friends across the aisle have somewhat of a problem, and I'll now be quiet. Oh, no, don't. Keep talking. Well, in any event. How do you get over the district court's finding that De Cheney applies, and as you know, De Cheney set forth the liberty test involving deprivation of liberty, and De Cheney gave some instances of, for example, incarceration, institutionalization, restriction of liberty. Where do these things occur that would avail you of due process violation? The issue is whether there was a special relationship between the Children's Bureau and my client, A.B., the 14-year-old girl. Involving a deprivation of liberty. Yes, and here's what it boils down to. If you look at the cases, the issue is not whose house she's in. The issue is whether the Children's Bureau has taken action which limits her ability to defend herself in this situation. When you say, well, this was just a third party. We've got no responsibility. First of all, it's their third party. When you say defend herself, you're talking about the child? Yes. Are you talking about state-created danger? I am, yes, to this extent. They remove her from her parents without a hearing, without probable cause, and they place her in this home. And what they do, and this is a critical fact, they tell her and they tell the parent, you may have no contact with that child. And when they do that, they are creating that special relationship. We have a 14-year-old child who's being violently raped. And where does a 14-year-old child go? She goes to her parents. But that's been cut off by the county. That's an after the fact. You didn't know she was being violently raped. The allegation was she was being raped by her father. That was the instantaneous allegation. There's a due process violation, a procedural due process. Under the Pennsylvania law, she's supposed to have, within 24 hours, a judge is supposed to issue an order. Within 72 hours, there's supposed to be a hearing. None of that occurred here. There was no mention of that. There's no hearing. Are you arguing under the Pennsylvania statutes, or are you arguing under constitutional due process for a due hearing? It's both. But it's constitutional due process because this court said in BS, there has to be some process. And here there was nothing. Of course, BS was a distinguishable case in many ways. It is. There were court orders and a transfer from one parent to the other. I think this is a much more grievous situation than BS. Do you not need to have custody in a case in order for there to be custody? Do you have to have custody? Yes. Well, that brings us to another question. In this particular case, who had custody? Certainly, R.B. and V.B., the parents of the child, did not have custody. Who was in control? And we stated in our brief that the issue is, is who's controlling this thing? So we would have to conclude that Westmoreland County had custody and had control of the child throughout these proceedings. Well, that's our position. But how did they have control if the father yielded custody? When the father was asked, the father agreed that the child could stay with the O'Briens. Where does the county get custody in this scenario? The issue, you see, we're talking once again, the critical issue is the separation of the parent from the child. Not where you put the child. And what happens in this case, what they do is they say, we are removing the child from your custody and your control. You will have no contact with the child. That is where we need a hearing. It's the separation, the familiar right. The thing that's being violated is a parent's right to be with their children, the child's right to be with the parents. But you say there was no right for the child to remain with her parents, given the allegation of rape that she'd made against her father. All right. That night, they have the child. They don't have a court order. They don't have any hearing. But then there are two things that occur. Are they supposed to go to court to get or have a hearing leaving the child in the home? No. With the allegation? No. Under the Child Protective Services Law in Pennsylvania, you need to get a court order within 24 hours. Tell me how that works. The county takes the child to the O'Briens and then goes to court with a complaint of some sort and petitions the court for a hearing to keep the child there. Is that the way it works? It's a two-step process. Under the Child Protective Services Law, what's to occur is they can – You're back to Pennsylvania statutes. Yes. They can immediately remove the child. It's often done. The police officers come, they remove the child. Under the Child Protective Services Law, they are to get a court order within 24 hours. It doesn't mean it's – it could be an ex parte proceeding. I think it usually is an ex parte proceeding. Within 72 hours, there is to be an informal hearing, a meaningful opportunity to be heard by the parents and the child. And in this particular case, that 72 hours was everything because within three days, everything pointed to the fact two things. First of all, the child's original statement that her father had sexually assaulted her was fabricated. The father presented evidence. The girl admitted to John Serra, the defendant here, that it was fabricated. He knew it was fabricated. So the original cause for removing – Was the evidence that it was fabricated or was the evidence that the investigators had some question that she was not being credible? She said – She said on one occasion that it was fabricated, and then she reverted to the prior story. I don't think so, no. But do you even get to any of these issues if indeed there was a voluntary agreement? As a matter of fact. Well, first of all, I'd like – we'd like to be able to explore whether there – if we assume that voluntariness is an issue of fact, we should be able to explore that through discovery and through a trial exactly what happened. Which was my first question. If it's a question of fact, Judge Schwab, on a motion to dismiss, found as a question, found that the agreement was voluntary, and based on his finding, he threw out the complaint. Can I just say one thing on the voluntariness? The way these work, a parent thinks that his child is being sexually assaulted. He calls the police because she's lost, and then this call comes in. And he's not advised of any of his rights. He's told we're taking the child, replacing him with these people, and we're discussing voluntariness. He has no idea what his rights are. In the Croft case, wasn't the doctor given an ultimatum as to his child? You either let your child leave, or your child would go to a foster home. No, the ultimatum was either you leave, or we're taking the child. In this particular case, which this court said was blatantly coercive. Is that the case that is closer to your circumstance? No. Is that the case that more closely supports your view? Absolutely. And then in this case, they said we will either put the child in foster care, or you will agree to put him with this person you think is a threat. Jesse Harris has a question. You allege a policy or custom of the county and the Children's Bureau, but only state that various citizens, quote, unquote, face the same situation as the plaintiffs here. Is there any case law that says that's adequate to allege a policy or custom? There's case law. There are various citizens, and in discovery, we certainly will provide them. But do you have any knowledge of these various citizens? Oh, yes. Okay. Is it in your complaint? Well, we state that it is. The question is, do we need to enumerate every person in a complaint where this has happened to? The most obvious one is Croft. In Croft, they admitted they did this. They admitted that this was their policy. This is 10 years later. It's the same agency. Thank you. But your friends are going to tell us that what we said was dicta in that case. Thank you. Thank you. Mr. Donahue? Good morning, Your Honors. Your Honors, I would reserve four minutes I think we have set aside for my co-counsel for his legal argument, co-defense counsel. Your Honors, my name is Tom Pellis. I'm here on behalf of the West Winona County, the West Winona County Children's Bureau, and the individual case workers who have been sued in this case. Your Honors, Judge Schwab, the Honorable District Judge, was 100% correct in the dismissal of both this complaint and the amended complaint. This was a voluntary agreement, he found, and everything flowed from that. That is correct, Your Honor. But isn't that a factual finding? No, it is not, Your Honor. They have alleged that in their pleadings. They acknowledge in their pleadings. First off, this case has absolutely no similarities, none whatsoever, to Croft. Croft, the key issue in Croft was we have an anonymous tip. That's it. Case worker goes out, anonymous tip. Based upon that anonymous tip, nothing else. Tells father, you have to leave this house right now or I'm taking Toddler with me. Completely different. What were the options that were given to the father in this case? In this case, Your Honor, after the child was taken to the police station, she filed a police report of abuse against her father. The father was contacted by the Children's Bureau and the police, the Ross-Draper Township Police, who told the father, this is where your daughter is. We found her. He called before to report her missing. This is where she is. We found her. She's with these friends, the O'Neills. That's where your daughter is. As I understand, I understand the record to be a straightforward option of you either let her stay with the O'Neills or she's going to be placed in foster care. No. The discussion is this, and this is contained in their complaint, Your Honor. That's why there are no factual issues. The discussion is your child, based upon these serious allegations, cannot stay in that home. We have to make sure that she is safe. She can go to France, her parents' home. You can identify for us friends or family where she can stay, or we can go to the court, file a petition, have the court decide what custody will be, where placement will be, which will be in foster care. But there's no voluntariness over the separation. The fact is that she was separated. Where she was going, I suppose, is a matter of discretion. But also they were told she's separated, and you can't have contact with her. That wasn't voluntary, was it? Your Honor, the voluntary, that is, I think, a new allegation in the complaint as far as the contact. Well, this is a 12B6 dismissal. That's correct, Your Honor. If there's any plausible view of the facts in the state alleged in the complaint, And there is not, Your Honor. There is not. The case is they went there to the father. They explained to the parents. You can select which route we're going to take. We're going to go see what's one county judge. We'll have them decide foster care. And there was a discussion. Their whole complaint is because there was a discussion that the parents in that case could be charged for the foster care, that this was somehow coercion. May I ask you something? Because I thought it was important, and you seem to suggest otherwise. The daughter ran away from home. Yes, Your Honor. And went to the O'Neills. Yes, Your Honor. And I understand that shortly thereafter, caseworker Gilmore phoned the father and mother to notify them that the daughter had been located. But because of the allegations against the father, the daughter would be staying with the O'Neills. And I thought you're disagreeing with that, but my impression is from the record that the caseworker said she either stays there or she goes to foster care, and you're going to have to pay. Would you correct my misimpression? Your Honor, generally your impression is correct. The specifics of it are we found your daughter. She came to the police station. She made these abuse claims against both of you. She's with the O'Neills. The O'Neills said she could stay there. That's an option. The other option is you can identify for us other family or friends where she can go. No, that's where the judge was wrong. That's a misstatement of the complaint. They go to the O'Neills. I'm sorry, Your Honor. They say friends in the complaint. Family was my misstatement. And then they go further and they say the O'Neills. So whatever. Paragraph 30 says the defendant, Karen Gilmore, informed the parents that A.B. would be staying at the O'Neill home. See, that leads me to a question. How is this voluntary then? You really have one of two bad choices. Your Honor, it's a bad situation. There's nothing that the caseworkers can do. They are clearly under the law, the caseworkers, the police. This child can't be turned home based upon these serious allegations that she's made against these parents. I don't doubt that. The obligation of the caseworkers is to keep the child safe. This is a tough circumstance. I agree with that. But what Mr. Lindsay is saying is, you know, if he had gotten us a hearing within maybe 72 hours, we could have aired all of this out. We could have determined that the O'Neill home was no place for this girl to be. Maybe we would have asked for an inspection of the home. We could have done any number of things. Well, Your Honor, the complaint does address that the children's group did do inspections. They went to the homes. They went to O'Neill's home. They went to these parents' homes. That's all in the complaint. Those aren't facts that we're throwing into the case. That all did take place. Over a period of a month. We're talking about, you know, a prompt. Even in their complaint, Your Honor, it's over a period of days if you break out the complaint. But the key is that the hearing in this case, it was discussed. This was the court's point in BS versus Somerset. You come in with an ex parte court order. You take a kid away from a parent and nothing else happens. That's clearly distinguishable from this. In this case, and it was discussed in the court's opinion, a discussion took place of the option to proceed to court. The entire child welfare system is premised upon the least intrusive means available. The goal of child welfare is to put and keep families together. To do that, the child welfare system, the Department of Welfare, the regulations in the Commonwealth of Pennsylvania say, find the least intrusive means. That's friends. That's someone that you know. We don't want to have to take custody. Last year, the DPW regulations suggested, found that in Westmoreland County alone, there were 578 cases of abuse filed and investigated. It is an unreasonable situation to believe that in each of those cases, we're going to require a 72-hour hearing, especially when custody has not been taken or disturbed. The child has been temporarily placed for the period... Mr. Lindsey said today, in response to one of my questions, that he's not arguing that they didn't have a right to protect the child. In other words, you didn't have a right to get her out. But in terms of procedural due process, there is some process due, quickly, to assure that the initial taking, to see whether it continues or not. So, I think... Well, I agree, Your Honor. And that process starts from the facts, the basis that we have, the reasonableness of the action. You know, if we take a look at Crofton, we take a look at the facts of this case, and then it goes from what happens. Was there discussion about the possible placement, the court involvement? That was an option that was discussed. How about the moment that the child's credibility started to become important? And at that moment, could there not have been a hearing to determine whether the allegations of sexual abuse had any credence or not? Your Honor, the statute has a 30-day period for the child welfare workers to complete their investigation. The legislature believes that that separation is acceptable in light of the importance of the allegations of abuse. This investigation was going on. And importantly, in their complaint, the District Attorney of Westmoreland County was still investigating that case at the time that they alleged that this change of opinion or statements happened from the child. DA was investigating it, and so was the Ross-Draper Police. They still hadn't made their decision. I understand that there's a lot going on, and I understand that this is a serious case. But as we said in ES, nothing is more fundamental than the right to be a parent. And when a child is taken away from a parent, that parent's right has to be addressed in a court hearing immediately. And, Your Honor, I think if it's... Immediately, you know, it could be a day or two. Any type of hearing that allows the parent to come forward and say, you know, this is not true. Your Honor, that, you are correct, but in this case, the child was not taken away from the parents as in other cases. In this case, the parents consented to the placement of the child. If we disagree with you and say, this was an involuntary departure, does that essentially undercut your case? Well, no, because the departure itself, we all agree, Mr. Lindsay agrees. That child can't go back. No parent, nobody is saying that this child, about these allegations against these parents, that that child can go back home. That child made allegations that the father attempted to rape her while the mother stood idly by. This was... And that there was a physical altercation. And she is, we're talking about a 15-year-old, not a 14-year-old, 15-year-old child. But the voluntary agreement on which Judge Schwab based his opinion was the agreement that she either go to the O'Neills or go to foster care at the parent's expense. I think that Judge Schwab's voluntary agreement, Your Honor, was that they agreed that she would go to the O'Neills. That's the agreement. That was the parent's agreement. Was that agreement coerced by the threat of putting her in foster care? See, Your Honor, that's where I differ in my brief. I don't find it a threat, Your Honor. I find that a fact, which is appropriate to state by a child welfare worker. Isn't that issue... Couldn't... You disagree. I mean, you think it wasn't coercive. Mr. Lindsay thinks it was. And I think we all agree it's a question of fact that was found by the district judge on the 12B6 motion. It was because it's contained in their pleading that they certainly consented to the child going to the O'Neills. That's the issue there. And the rest of their complaints amended and original do not state any constitutional claims of any kind. Thank you, Mr. Powis. Mr. Greenfield. May it please the Court, I'm Stanley Greenfield. I represent the O'Neills. As Your Honors know, I'm here and the O'Neills are in the case and included in this federal action by virtue of the fact that there is an alleged pendant jurisdiction for the Court to have it because the complaint alleges only state causes of action against the O'Neills for false imprisonment and for negligence, neither of which, of course, would provide the federal court with jurisdiction. There's no federal question. We are not conspirators or alleged to be conspirators with Westmoreland, so there is no violation of civil rights in the sense that we aided and abetted that in the allegation form of it. And so consequently, the only way we are in the case is as a matter of pendant jurisdiction. So if this case goes back to Judge Schwab, you're still in the case, right? I'm sorry, Your Honor? For this case to go back to Judge Schwab. If the case goes back to Judge Schwab. You're still in the case. Then we would be remanded as well, but the judge would have the independent right at that point to make a second judgment with respect to whether he should maintain federal pendant jurisdiction with regard to the claim. And that was the second point that we raised in our motion to dismiss before the judge. He didn't rule on that one. He just ruled on the first portion of our motion to dismiss, which was simple plain pendent jurisdiction under 1367, which says that... If this case, if Westmoreland County prevails, then your case goes back to state court. Yes, and an action has, in fact, well, it's not a record. It's been filed in the state court already. Thank you. Ending there. Okay. I have no other... Good. Thank you, Mr. Greenfield. Mr. Lindsey? Just two things. It's suggested when the conversation occurred by the Children's Bureau operative and RV that night that an option was given that you could stay with family and friends of your choosing. That is not in the amended complaint in any shape, manner, or form. The friend they were talking about was the O'Neills. The second thing, it was suggested that state law, Pennsylvania state law, provides 30 days to do an investigation. It does, but not without a hearing. They have those initial hearings that have to take place, specifically the 72-hour hearing, and usually there's a pendency hearing that would have occurred. And finally, the issue is, is the court has discussed, but it's the context, and what's so important is to understand the factual fabric. Before you go on, did your client request a hearing ever? He didn't even know he had a right to a hearing. The question is, no he did not. And that's part of the problem. When they say, well, they could have gone to court, the issue with the child worker put this to RV. It was not like you have a right to have a court hearing to have these things litigated and you could present a fair hearing. Unless you agree to this, we're going to take you to court and make you pay. The court is not an option to help him. The court is a threat. Thank you, sir. Thank you, Mr. Lindsay. Thank you all for very well presented arguments. We'll take your case under advisement.